Randy Edward **JOHNSON**,
Appellant–Defendant,

v.

**STATE** of Indiana, Appellee–Plaintiff.

No. 53A01–1002–CR–38.

Court of Appeals of Indiana.

June 29, 2010.

William Van Der Pol, Jr., Martinsville, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ann L. Goodwin, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Randall Edward Johnson (Johnson), appeals his conviction for child molesting, a Class A felony, Ind. Code § 35–42–4–3(a)(1).

We affirm.

### ISSUES

Johnson raises two issues on appeal, which we restate as:

(1) Whether the trial court had a duty to investigate Johnson's complaints regarding the quality of his trial counsel's representation while his criminal case was unfolding; and

(2) Whether the State committed prosecutorial misconduct when it characterized physical evidence at the crime scene as supporting the victim's version of events.

### FACTS AND PROCEDURAL HISTORY

During the summer of 2007, thirteen-year-old E.C. spent a lot of time at the home of Johnson, her uncle, with whom she had a close father-daughter relationship. On August 18, 2007, E.C. was at Johnson's home, babysitting his daughter. During this visit, Johnson offered E.C. a beer, the taste of which made her gag. Next, Johnson gave her a wine cooler, which she disliked. Johnson then served her shots of orange-flavored vodka. After the ninth shot, E.C. lost count of how much vodka she had consumed and became intoxicated.

Johnson and E.C. started playing poker and Johnson made a bet with E.C. that whoever lost would have to suck the other person's toe. Johnson lost and he sucked E.C.'s toe. Eventually, E.C. began to feel ill. She attempted to run to the bathroom but started vomiting in the hallway before she could reach the bathroom. As she was vomiting Johnson commented on how sexy and cute her "ass" was. (Transcript p. 34). E.C. began to pass out with her arm around the toilet.

Johnson offered to carry E.C. to his bedroom so that she could lie down. Even though E.C. refused and clung to the doorway of the bathroom, Johnson carried her to his room nevertheless. After putting

E.C. on his bed, Johnson covered her with six or seven blankets. After a while, Johnson told E.C. that it appeared that she was getting hot and he asked E.C. if she "wanted to take an article of clothing off." (Tr. p. 35). E.C. replied that she was fine but Johnson took off her pants anyway. While E.C. was "dazing in and out," she heard a "plastic or something tearing" and noticed that Johnson also removed her underwear and shirt. (Tr. p. 36). Johnson started kissing E.C.'s neck and chest. He forced E.C.'s knees apart and placed his penis in her vagina. Several times during the intercourse, Johnson asked E.C. if she liked it. Receiving no response, Johnson told E.C. that if she didn't tell him that she enjoyed it, he "would give it [ ] up the ass." (Tr. p. 38). Johnson then tried to place his penis in E.C.'s mouth before replacing it in her vagina.

After a while, E.C. regained her composure and threatened to call her mother. Johnson immediately jumped up and "begged [her] not to tell anybody" because he did not want to lose custody of his daughter. (Tr. p. 39). E.C. tried to dress herself. When she went to the bathroom, she noticed blood in her urine. E.C. fell asleep and was woken up by Johnson's daughter the next morning.

E.C. did not see Johnson again until mid-October when she was at her aunt's house and Johnson unexpectedly visited. After he had left, E.C. told her aunt what had happened on August 18. E.C.'s aunt insisted that she begin therapy. As E.C. underwent counseling, her counselor reported the incident to the police.

On March 26, 2008, the State filed an Information charging Johnson with child molesting, a Class A felony. On September 18, 2008, the State filed an amended information adding the new charge of rape, a Class B felony. On June 3, 2009, the trial court received a letter from Johnson, complaining about the quality of his public defender's representation. Responding in a chronological case summary entry that was forwarded to Johnson and his counsel, the trial court stated

> The [c]ourt, after review of [Johnson's] correspondence, informs [Johnson] that the [c]ourt only has the authority to appoint the Monroe County Public Defender, and cases are then assigned to individual Public Defenders by that office. The [c]ourt therefore forwards [Johnson's] correspondence to the Public Defender, the State of Indiana and to Chief Public Defender.

(Appellant's App. p. 74).

On September 1, 2009, the State filed a motion to dismiss the rape charge which the trial court granted the same day. On September 2 through September 4, 2009, the trial court conducted a jury trial. At the close of the evidence, the jury found Johnson guilty as charged. On October 6, 2009, during a sentencing hearing, the trial court sentenced Johnson to thirty-five years executed, with five years suspended.

Johnson now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Johnson's Complaints* [1]

▮ Johnson contends that his particularized complaints about the quality of his

---

1. By separate Order of the same date as this Opinion, we grant the State's Motion to Strike Portions of Appellant's brief. We agree with the State that Appellant's brief contains references of fact that were not before the trial court and that are unsubstantiated by the record on appeal. Therefore, we strike all references in Johnson's appellate brief to the fact that Johnson's trial counsel has been disciplined in the past and that he has recently been suspended from the practice of law.

assigned counsel's representation created a conflict of interest that the trial court had an obligation to investigate.[2] He asserts that rather than inquiring about the perceived conflict, the trial court merely forwarded his complaint to the Monroe County Office of the Public Defender and as a result, he now maintains, the trial court endangered his Sixth Amendment right to representation by counsel.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall ... have the assistance of counsel for his defense." U.S. CONST., AMENDMENT VI. Typically, the right to counsel includes the right to counsel of one's choice:

> The right to counsel of choice has been described as an "essential component" of the Sixth Amendment right to counsel.... The right to privately retain counsel of choice derives from a defendant's right to determine the type of defense he wishes to present. Lawyers are not fungible, and often the most important decision a defendant makes in shaping his defense is the selection of an attorney. In situations where a defendant is able to retain counsel privately "the choice of counsel rests in his hands, not in the hands of the state." In criminal cases, the right to retain counsel of choice becomes a question of fundamental fairness, the denial of which may rise to a level of constitutional violation.

*Barham v. State*, 641 N.E.2d 79, 82 (Ind. Ct.App.1994). However, whereas a criminal defendant has a right to privately retain a counsel of his own choice, no such right is recognized with regard to the appointment of a public defender. In other words, while an indigent defendant has the right to representation by counsel, he has no right to representation by court-appointed counsel of his choice. *Moore v. State*, 557 N.E.2d 665, 668 (Ind.1990).

■ Although the Sixth Amendment guarantees defendants effective, albeit not perfect, representation by counsel, this guarantee does include representation that is free from any actual conflict of interest with counsel. *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980); *Ward v. State*, 447 N.E.2d 1169, 1170 (Ind.Ct.App.1983). An "actual" conflict of interest means "that the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests," and "which by its nature, is so threatening [as] to justify a presumption that the adequacy of representation was affected." *U.S. v. Ziegenhagen*, 890 F.2d 937, 939–40 (7th Cir.1989).

■ Generally speaking, ineffective assistance of counsel claims are governed by the standard set forth in *Strickland*, i.e., that "counsel's performance fell below minimum professional standards, [and] also that his counsel's failure was so prejudicial that it probably changed the outcome of his trial." *Strickland v. Washington*, 466 U.S. 668, 691–96, 104 S.Ct. 2052, 2066–69, 80 L.Ed.2d 674 (1984). But where, like here, a potential conflict of interest is the basis for the Sixth Amendment claim, then prejudice may or may not be presumed. "If the defendant or his attorney give the trial court notice of an alleged conflict, and the trial court fails to inquire into the conflict, a reviewing court will presume prejudice upon a showing of possible prejudice." *Holloway v. Arkansas*, 435 U.S. 475, 487–88, 98 S.Ct. 1173, 1180–81, 55 L.Ed.2d 426 (1978). *In Patterson v. State*, 270 Ind. 469, 386 N.E.2d

---

2. We clarify that Johnson does not present this court with a traditional ineffective assistance of counsel claim; rather, Johnson focuses his argument on the trial court's role when faced with a potential conflict of interest between a defendant and his counsel.

936, 941 (1979), *cert. denied,* 444 U.S. 935, 100 S.Ct. 283, 62 L.Ed.2d 194 (1979), we held that "the adequacy of the inquiry must be judged in the light of the individual situation and the likelihood that a conflict will arise."

In the case before us, the trial court was notified of a potential conflict between Johnson and his counsel by receipt of Johnson's letter, dated June 3, 2009. In this letter, Johnson asserts, in pertinent part, as follows

I am requesting that my current public defender be released from being appointed to me and for to be another public defender provided for me. I feel my rights have been violated and I am filing a[ ] Request for Investigation of [counsel]. I feel I have no choice in this but to do so since my numerous request[s] go [un]answered by [counsel].

. . .

I have seen my public defender 1 time. My jury trial has been rescheduled numerous times because Monroe County is too busy to give me my fair trial. . . . I have seen my public defender's assistant one time as well. He told me he didn't know anything about my case but would come back up and see me. I haven't seen him since. That was sometime last year. . . . My brother calls [my public defender] but he doesn't return calls or answer any of the numerous letters I've written to him. I have no contact with him as far as his responding to me. I see him in court where he tells me he will personally be up to see me but I see that he has no intention of coming to see me. I haven't talked to him since August 08 and then only briefly. I have informed him of witnesses on my behalf. Yet in court I overhear him say that there will be only the state's witnesses. I try to ask him about this he says I'll be up to see you soon. I have no way of getting a hired lawyer so I'm stuck with a public defender but I should not have to settle for no legal assistance because someone feels they are too busy to come and properly defend me.

(Appellant's App. pp. 76–78). Upon receipt of this letter, the trial court forwarded Johnson's complaint to the Public Defender's Office and notified Johnson that its authority is limited to the appointment of the Monroe County Public Defender Office and that it is the Office's internal obligation to assign cases to individual public defenders.

Based on the content of this letter, it is clear that Johnson's perceived conflict of interest arises out of his personal dissatisfaction with his counsel's representation and handling of his defense. A review of the case law discloses that an actual conflict of interest is most often found when the same attorney handles the defense of co-defendants. *See Holloway,* 435 U.S. at 489–90, 98 S.Ct. 1173; *Cuyler,* 446 U.S. at 337, 100 S.Ct. 1708. Also, courts have found an actual conflict of interest where a defendant claimed his attorney forced him to plead guilty and his attorney disputed that claim. *See United States v. Shorter,* 54 F.3d 1248, 1254 (7th Cir.1995).

Likewise, in *Harris v. State,* 273 Ind. 60, 403 N.E.2d 327, 328 (1980), defendants and a third co-defendant were represented in a joint trial by the same counsel. Several times during trial, counsel moved for leave to withdraw, indicating to the court that a conflict of interest had arisen because of a plea agreement offered by the State. *Id.* Counsel's motions were denied. *Id.* Although counsel offered to explain more fully in an in-camera hearing, the trial court indicated that it could not participate in any way in the plea negotiations and denied the request. *Id.* Defendants, however, were permitted to address the court outside the presence of the jury, although

they were not allowed to describe any details of the plea negotiations. *Id.* They indicated that they were dissatisfied with trial counsel because of "strong differences in personality and opinion," and because counsel "kept pushing the plea bargain" and "so strongly urged" that they accept it. *Id.* On appeal, we determined that the conflict, if any, was between the defendants and their attorney, and not between co-defendants. *Id.* Under these circumstances, we found that the trial court's inquiry into the potential conflict was adequate. *Id.*

Similarly, under the circumstances before us, we conclude that no actual conflict existed such that the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests, but rather only a potential conflict occurred between Johnson and his counsel. *See Ziegenhagen,* 890 F.2d at 939–40. In this light, we find that the trial court's inquiry into Johnson's complaint was adequate. Johnson's complaint indicated a difference of personal opinion between Johnson and his counsel on how his defense should be handled and as a result, during the proceedings and prior to trial, Johnson articulated a desire to be appointed a different Monroe County public defender. The creation of a duty for the trial court to investigate differences of personal opinion between a defendant and his counsel on how to conduct a defense during the pendency of the criminal proceedings could necessitate in the revelation of trial strategies in advance and the abandonment of the attorney/client confidence. This we cannot support. However, because Johnson articulated his dissatisfaction and expressed a strong request for the appointment of another public defender and whereas the trial court can only assign cases to the Office of Public Defender, with the Office having the duty to assign the case to an individual public de-

fender, we find that the trial court's action of formally noting Johnson's displeasure on the chronological case history and forwarding his request to the Monroe County Public Defender Officer reasonable.

 Moreover, even assuming *arguendo* that the trial court's inquiry was unreasonable, Johnson failed to establish that the continued representation by his counsel resulted in any prejudice. *See Holloway,* 435 U.S. at 487–88, 98 S.Ct. 1173.

## II. *Prosecutorial Misconduct*

 Johnson next claims that the State committed misconduct during its closing argument. Specifically, he maintains that the State mischaracterized the scientific evidence that was presented to the jury and thereby subjected Johnson to grave peril.

 Initially, we note that Johnson failed to object when the State made the challenged remarks during closing argument. Ordinarily, the failure to object at trial results in waiver of the issue on appeal. *Smith v. State,* 792 N.E.2d 940, 943 (Ind.Ct.App.2003), *trans. denied.* However, a party may escape waiver of an issue for failure to object, if the claimed error is fundamental in nature. Fundamental error is defined as an error so prejudicial to the rights of a defendant that a fair trial is rendered impossible. *Perez v. State,* 872 N.E.2d 208, 210 (Ind.Ct.App.2007), *trans. denied.* To be considered fundamental, an error must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process. *Id.* at 210–11. In his appellate brief, Johnson failed to assert how the alleged misconduct by the State constituted a fundamental error. As such, he waived his claim. *See* Indiana Appel-

late Rule 46(A)(8)(a). Nevertheless, we will evaluate his argument on the merits.

The focus of Johnson's claim appears to be that the State improperly informed the jury during closing argument that a stain discovered on the hallway carpet of Johnson's residence was "vomit when in fact the scientific evidence not only did not bolster the claim, but in fact refuted the claim, was an inappropriate, misguided, and improper argument." (Appellant's Br. p. 14). We disagree.

According to E.C.'s testimony, she vomited in the hallway of Johnson's residence on August 18, 2007, and had never before vomited in his house. The forensic serologist, a State's expert witness, examined a carpet swatch taken from the hallway outside of Johnson's bathroom and presented it to the jury as State's Exhibit 4. He explained at trial that the stain on the hallway carpet

> was made from [ ] possible vomits. It looked like there was possible food material around a red staining, which was a layman's terms I equate with vomits and I know from my training for serology that is possible to get DNA from vomits from the lining of the asphyxias and other parts of the digestive tract.

(Tr. p. 201). He also added that the stain did not test positive for seminal fluids. Upon further questioning, the forensic serologist clarified that because it is possible that DNA from the lining of the throat or in the inside of the stomach is present in vomit, he processed a portion of the hallway carpet for DNA testing. Although he testified about "possible vomit" being present on the exhibit, he was not completely positive as there is "no way to scientifically test for vomit." (Tr. p. 203). Regardless, when tested, the exhibit disclosed that E.C.'s DNA was found on the hallway carpet.

During closing argument, the State acknowledged that the stain on the hallway carpet looked like vomit to the forensic serologist and argued, in pertinent part, as follows:

> For serology it tested as to nothing, but he looked at it, and what did it look like to him? Vomit, and what does he know from his training and experience? That you can get vomit or you can get DNA from vomit. Okay? So he took it and retained it for DNA analysis. He sent it on. The DNA report, what does it tell us? The DNA profile that came from the cutting, so the carpet outside the bathroom, in the hallway that [E.C.] had to run down as she was puking because [Johnson] got her drunk, contained the DNA profile of [E.C.]. So what does this tell us? This DNA swab that [the police department] got from [E.C.], plus the cutting from the carpet outside the hallway that appeared to have vomit on it, matched that [E.C.'s] vomit was on the carpet.

(Tr. pp. 298–99).

In light of the evidence presented at trial, we cannot conclude that the State mischaracterized the forensic serologist's findings. Therefore, we find that the State did not commit error, let alone a fundamental error.

### CONCLUSION

Based on the foregoing, we conclude that the trial court conducted an adequate inquiry into Johnson's complaints regarding the quality of his trial counsel's representation while his criminal case was unfolding and that the State did not commit prosecutorial misconduct during closing arguments.

Affirmed.

KIRSCH, J., and MATHIAS, J., concur.