ATTORNEY FOR APPELLANT
William Van Der Pol, Jr.
Martinsville, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Andrew Kobe
Ann L. Goodwin
Deputy Attorneys General
Indianapolis, Indiana

In the

# Indiana Supreme Court

No. 53S01-1106-CR-335

FILED
Jun 08 2011, 11:50 am

CLERK
of the supreme court,
court of appeals and
tax court

RANDALL EDWARD JOHNSON,

*Appellant (Defendant below)*,

v.

STATE OF INDIANA,

*Appellee (Plaintiff below)*.

Appeal from the Monroe Circuit Court, No. 53C09-0803-FA-00289
The Honorable Teresa D. Harper, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 53A01-1002-CR-00038

**June 8, 2011**

**Sullivan, Justice.**

The defendant in this criminal case wrote the judge a few months prior to trial complaining that his public defender, who had a well-documented history of neglecting clients, had been neglecting his case. The judge passed the complaint along to the county public defender's office, reasoning that she had no authority to take further action. The judge's failure to inquire further did not violate Johnson's Sixth Amendment right to the effective assistance of counsel. We

hold, however, that a judge faced with similar circumstances must at the very least receive assurances from the public defender's office that the complaint has been adequately addressed. But because Johnson failed to renew his objection at trial and because defense counsel appeared at trial and subjected the State's case to meaningful adversarial testing, we affirm.

**Background**

Randall Johnson was convicted by a jury of Class A felony child molesting[1] in a trial where the evidence showed that he had had sex with his 13-year-old niece after getting her drunk. He was sentenced to 35 years imprisonment. A full account of the crime is outlined in the opinion of the Court of Appeals. See Johnson v. State, 928 N.E.2d 893, 895-96 (Ind. Ct. App. 2010).

On June 3, 2009, approximately three months prior to trial, Johnson sent a letter to the trial court judge complaining that his public defender, Patrick Schrems, was ignoring his case. In the letter, Johnson in some detail complained that he had not seen his attorney since August, 2008 ("and then only briefly"); that his attorney did not answer his numerous letters or return his brother's phone calls; and that when they saw each other at pretrial hearings, the attorney would tell him that he would be coming to see him at the jail but never did. Id. at 898. When the judge got Johnson's letter, she "forwarded Johnson's complaint to the Public Defender's Office and notified Johnson that [her] authority [was] limited to the appointment of the Monroe County Public Defender Office and that it [was] the Office's internal obligation to assign cases to individual public defenders." Id. Neither the judge nor Johnson took further action on the matter prior to trial. Johnson's jury trial was conducted on September 2 through September 4, 2009, and he was sentenced on October 6, 2009. Neither Johnson nor his counsel raised any objections to the representation during the trial or the sentencing hearing.[2]

---

[1] Ind. Code § 35-42-4-3(a)(1) (2008).

[2] On October 15, 2009, Johnson sent a second letter to the trial court judge informing her that he wished to file an appeal on grounds of ineffective assistance of counsel but that neither Schrems nor the public defender's office had responded to his attempts to communicate. Appellant's App. 23. The judge responded to this second letter on November 2, 2009, by ordering Schrems to file a Notice of Appeal on Johnson's behalf. Id. at 21-22. Appellate counsel was appointed after Johnson sent a third letter to the judge on January 14, 2010. See id. at 10-12.

On appeal, Johnson raised two issues, both of which were considered and rejected by the Court of Appeals. The court first rejected Johnson's claim that his Sixth Amendment right to the effective assistance of counsel had been violated by the trial court's failure to conduct an adequate inquiry upon receipt of his letter of June 3, 2009. Id. at 897-99. The thrust of his argument was that counsel's neglect and failure to pursue the potential witnesses Johnson had identified created an actual conflict of interest between him and counsel. The court held that only a potential conflict existed, not an actual conflict, and also that the trial court had handled Johnson's complaint reasonably when it forwarded the complaint to the Monroe County Public Defender's office. Id. at 898-99. Related to this issue, the court also granted the State's motion to strike from Johnson's appellate brief any reference to the fact that Schrems had been disciplined by this Court for conduct mirroring that which occurred in Johnson's case, reasoning that this was factual matter that was "not before the trial court and . . . unsubstantiated by the record on appeal." Id. at 896 n.1. The court also rejected Johnson's contention that the prosecutor had committed prosecutorial misconduct by mischaracterizing certain forensic evidence during closing arguments. Id. at 899-900.

Johnson has petitioned this Court for transfer, which we now grant, thereby vacating the opinion of the Court of Appeals, Ind. Appellate Rule 58(A). We address only the State's Motion to Strike and the Sixth Amendment claim. We summarily affirm the holding of the Court of Appeals that there was no prosecutorial misconduct. App. R. 58(A)(2).

**Discussion**

**I**

As an initial matter, we disagree with the decision of the Court of Appeals to grant the State's Motion to Strike portions of the defendant's appellate brief referencing the fact that his counsel had been disciplined in the past and was subsequently suspended from the practice of law on the basis that these "facts" were not before the trial court. Johnson, 928 N.E.2d at 896 n.1. This Court administers our state court system and regulates the Indiana legal profession in

3

the public's interest, and pursuant to those duties, we suspended the defendant's lawyer because he neglected his clients, the very reason prompting the defendant's complaint to the trial judge in this case. In re Schrems, 922 N.E.2d 618 (Ind. 2010); see also In re Schrems, 856 N.E.2d 1201 (Ind. 2006) (publicly reprimanding attorney for neglecting clients). This Court's decisions imposing discipline on Johnson's lawyer were published in the bound volumes of this Court's opinions and were before the trial court and the Court of Appeals to the same extent as our decisions in other litigated matters.

## II

Even considering trial counsel's past disciplinary action, Johnson has failed to establish that his Sixth Amendment rights were violated. The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984) (citation omitted). Claims of ineffective assistance are generally governed by the familiar two-part standard set forth in Strickland v. Washington, which requires the defendant to establish both (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defendant. Id. at 687-96.

Ineffective assistance of counsel can occur where counsel is burdened by a conflict of interest, in which case special rules apply.[3] Wood v. Georgia, 450 U.S. 261 (1981); Cuyler v. Sullivan, 446 U.S. 335 (1980); Holloway v. Arkansas, 435 U.S. 475 (1978); Glasser v. United States, 315 U.S. 60 (1942). Here, Johnson argues that an actual conflict of interest existed between him and counsel because he wanted counsel to interview certain unidentified beneficial witnesses but counsel chose to neglect his case and not interview those witnesses. According to Johnson, he notified the trial court judge of this conflict and the judge failed to conduct an adequate inquiry when it responded that it could do nothing but send the complaint to the Monroe County Public Defender's Office; and, therefore, he argues that this case falls under Holloway and his conviction should be reversed. We disagree.

---

[3] A defendant, however, may waive his or her right to conflict-free counsel. Holloway, 435 U.S. at 483 n.5 (citation omitted); see also Glasser, 315 U.S. at 70 (relying on Johnson v. Zerbst, 304 U.S. 458, 464 (1938), to hold that the defendant did not waive his right to counsel); cf. Holloway, 435 U.S. at 482-83 (noting that multiple representation by counsel may be advantageous).

Johnson has failed to allege even a potential conflict of interest. According to the record, counsel's failure to pursue these potential witnesses was not due to any division of loyalties but instead to counsel's neglect of Johnson's case. Johnson has not identified any other client or interest to which counsel owed a duty of loyalty that challenged counsel's duty of loyalty to Johnson.

Even assuming that this ordinary case of attorney neglect represents a conflict of interest, it "is not remotely the kind of conflict of interests dealt with in Cuyler v. Sullivan." Nix v. Whiteside, 475 U.S. 157, 176 (1986). Although here we, like many courts, have phrased the conflict-of-interest exception to Strickland in general terms,[4] the only cases in which the U.S. Supreme Court has applied these "conflict of interest" rules are those where counsel is conflicted because he or she is actively representing multiple parties with conflicting interests ("multiple representation"). See Mickens v. Taylor, 535 U.S. 162, 167-70 (2002) (discussing Holloway, Sullivan, and Wood). In Holloway, three codefendants were represented by the same counsel in a single trial over defense counsel's objection to the trial court that he could not adequately represent the defendants' divergent interests. 435 U.S. at 477-80. And in Sullivan, three defendants each accused of murder were tried separately but represented by the same counsel, and the Court remanded for a determination whether an actual conflict adversely affected counsel's strategy in Sullivan's trial. 446 U.S. at 337-39, 350. The facts of Wood were slightly different in that the three indigent defendants were represented by their employer's attorney, but the record suggested that the employer's interests diverged from the defendants' interests so the Court remanded to determine whether this potential conflict was an actual conflict that adversely affected counsel's performance. Wood, 450 U.S. at 266-73.

---

[4] See Beets v. Scott, 65 F.3d 1258, 1266 (5th Cir. 1995) (en banc) (stating that "the federal circuit courts have unblinkingly applied Cuyler's 'actual conflict' and 'adverse effect' standards to all kinds of alleged attorney ethical conflicts"). See generally 3 Wayne R. LaFave et al., Criminal Procedure § 11.9(a) (3d ed. 2007); Mark W. Shiner, Note, Conflicts of Interest Challenges Post *Mickens v. Taylor*: Redefining the Defendant's Burden in Concurrent, Successive, and Personal Interest Conflicts, 60 Wash. & Lee L. Rev. 965 (2003).

Johnson has not alleged that his trial counsel's loyalties were divided between Johnson and another client.[5]  We hold that Johnson has failed to establish that his trial counsel was burdened by a conflict of interest sufficient to trigger the Sixth Amendment duty of inquiry under Holloway or Sullivan.

**III**

Even though the Sixth Amendment did not impose a duty on the trial court judge to inquire into Johnson's complaint, we think that, under circumstances similar to those in the present case, a judge should do more than simply pass the complaint along.

More than a century before Gideon v. Wainwright, 372 U.S. 335 (1963),[6] this Court held that indigent criminal defendants had a right to counsel provided at public expense.  Webb v. Baird, 6 Ind. 13, 18-19 (1854).  Historically, Indiana trial court judges appointed indigent defense counsel and mandated their compensation from their respective county treasuries.  Standards for Indigent Def. Servs. in Non-Capital Cases Standard A cmt., at 1-3 (Ind. Pub. Defender Comm'n 2008), available at http://www.in.gov/judiciary/pdc/publications.html (last visited June 6, 2011).  One of the inherent problems with this system was the lack of defense counsel's inde-

---

[5] To be sure, at oral argument before this Court, Johnson's appellate counsel argued that Johnson had filed a disciplinary complaint with the Indiana Supreme Court Disciplinary Commission prior to trial, but the record is unclear.  Even assuming that Johnson filed a disciplinary complaint against Schrems prior to trial, the personal conflict of interest that would have been created is not the type of conflict to which Holloway and Sullivan apply.  See Mickens, 535 U.S. at 174-76 (suggesting that lower federal courts have extended Sullivan too far in applying that lower standard to, inter alia, personal conflicts); Whiteside, 475 U.S. at 176 (holding that a conflict created by counsel's duty to report a client's intent to commit perjury was "not remotely the kind of conflict of interests dealt with in Cuyler v. Sullivan"); Beets, 65 F.3d at 1266-72 (holding that Sullivan does not apply to personal conflicts and explaining the reasons for distinguishing between multiple representation and personal conflicts); cf. State v. Sinclair, 730 P.2d 742, 744 (Wash. Ct. App. 1986) (filing of disciplinary complaint by defendant not sufficient to justify disqualification of appointed counsel).  But see, e.g., Mathis v. Hood, 937 F.2d 790, 794-96 (2d Cir. 1991) (affirming district court's grant of habeas relief because conflict created by defendant's filing of disciplinary complaint under the particular circumstances was a per se violation of the Sixth Amendment); Carter v. Commonwealth, 400 S.E.2d 540, 542-43 (Va. Ct. App. 1991) (holding that Holloway applied where defense counsel sought to withdraw because the prosecution had levied allegations of attorney misconduct against defense counsel).

[6] In Gideon, the United States Supreme Court held that the Sixth Amendment and the Fourteenth Amendment required states to appoint counsel for indigent criminal defendants, at public expense.  372 U.S. at 344-45.

6

pendence from the court; because defense counsel's employment relied upon the judge, it was thought that counsel might be reluctant to represent his or her client as vigorously as necessary for fear of alienating the judge. Id.; see also Nat'l Right to Counsel Comm., Constitution Project & Nat'l Legal Aid & Defender Ass'n, Justice Denied: America's Continuing Neglect of Our Constitutional Right to Counsel 80 (2009), available at http://www.constitutionproject.org/pdf/139.pdf (last visited June 6, 2011) (discussing the problems with lack of independence for indigent defense counsel and concluding that "the lack of independence of the defense function threatens the right to counsel"); cf. Cantrell v. Morris, 849 N.E.2d 488 (Ind. 2006) (answering a certified question that arose in a suit by a former public defender alleging that a newly elected East Chicago City Court Judge had terminated his employment due to his political affiliation).

In 1989, the General Assembly created the Indiana Public Defender Commission ("Commission"), Pub. L. No. 284-1989, 1989 Ind. Acts 1982, 1982-92, which began a series of reforms to improve indigent defense services. The Commission's original mission was to make recommendations concerning providing indigent counsel in capital cases, most of which were adopted by this Court in Indiana Criminal Rule 24. See generally Norman Lefstein, Reform of Defense Representation in Capital Cases: The Indiana Experience and Its Implications for the Nation, 29 Ind. L. Rev. 495 (1996).

In 1993, the General Assembly authorized the Commission to offer state reimbursement to counties for the costs of indigent defense in noncapital cases, provided the counties complied with standards established by the Commission. Pub. L. No. 238-1993, 1993 Ind. Acts 4449, 4451-52. To qualify, a county must establish a county public defender board, which appoints indigent defense counsel at public expense for all persons financially unable to obtain a lawyer without substantial hardship to themselves or their families. I.C. §§ 33-40-7-1 to -12; Standards for Indigent Def. Servs. in Non-Capital Cases, supra, Standards A-B, at 1-4. Appointed counsel must satisfy certain experiential and training requirements, which vary depending on the seriousness of the charge, and appointed counsel's caseload must be limited to a specified amount. Standards for Indigent Def. Servs. in Non-Capital Cases, supra, Standards E-F, J-K, M, at 8-10, 13-19, 23-24. The Commission's standards also govern appointed counsels' compensation. Id. Standards G-I, L, at 10-13, 20-23. Counties that comply with these standards are reimbursed for

7

40% of their indigent defense costs for noncapital cases. I.C. § 33-40-6-5(a)(2). Unlike the capital defense program under Criminal Rule 24, the noncapital program is optional, though the Commission reports that it has approved comprehensive plans for 58 of Indiana's 92 counties, and 50 of those counties are eligible for reimbursement. Ind. Pub. Defender Comm'n, Annual Report 2009-2010, at 7-8 (2010), available at, http://www.in.gov/judiciary/pdc/publications.html (last visited June 6, 2011).

Indiana's reform of public defender services has been lauded by the American Bar Association and legal scholars alike.[7] Undoubtedly, one of the most important reforms for noncapital cases was ensuring the independence of defense counsel by transferring the duty to appoint counsel from judges to county public defender boards. See Gerald L. Bepko, The Lefstein Years: A Prescription for Leadership, 36 Ind. L. Rev. 7, 10 (2003) (paying tribute to the former chair of the Indiana Public Defender Commission for working "to secure the independence of the indigent defense function from undue judicial influence in criminal cases and post-conviction death penalty proceedings"); Symposium on Indigent Criminal Defense in Texas, 42 S. Tex. L. Rev. 979, 988 (2001) (statement of Dean Norman Lefstein) ("I suggest to you that the most important of those principles [developed in the indigent defense area], the most important standard, is that no matter how indigent defense is provided, it should be structured in such a way as to ensure the independence of the defense function."); see also Pablo Ros, State Program Has Its

---

[7] See, e.g., Standing Comm. on Legal Aid & Indigent Defendants, Am. Bar Ass'n, Gideon's Broken Promise: America's Continuing Quest for Equal Justice 36 (2004), available at http://www.americanbar. org/content/dam/aba/migrated/legalservices/sclaid/defender/brokenpromise/right_to_counsel_in_criminal _proceedings_fullreport.authcheckdam.pdf (last visited June 6, 2011) ("The Indiana legislation was cited in an ABA resolution as an effective means for enforcing indigent defense standards." (citing Standing Comm. on Legal Aid & Indigent Defendants, Am. Bar Ass'n, Report with Recommendation to the ABA House of Delegates (Aug. 1998))); Lord Windlesham, Politics, Punishment, and Populism 137 (1998) (stating that "[f]ew states could match an Indiana initiative to improve the quality" of indigent criminal defense); John Gibeaut, Declaring Independence, A.B.A. J., Dec. 2001, at 41, 41 (providing that experts often cite as an example the Indiana Public Defender Commission's efforts in "making sure defenders operate autonomously and follow uniform standards"); Robert L. Spangenberg & Marea L. Beeman, Indigent Defense Systems in the United States, 58 Law & Contemp. Probs. 31, 39-40 (1995) (noting the improvements in Indiana's indigent defense system due to the work of the Commission); Scott Wallace & David Carroll, The Implementation and Impact of Indigent Defense Standards, 31 S.U. L. Rev. 245, 292-96 (2004) (discussing the myriad benefits experienced by Vanderburgh County, Indiana, once it joined the program for noncapital cases); Randall T. Shepard, State of the Judiciary: "What Has Indiana Done About This?", Res Gestae, Feb. 2000, at 15, 15 ("When the American Bar Association recently urged that all states adopt minimum standards for indigent defense, its House of Delegates held up Indiana as a model for others to follow.").

Faults; But Proponents Say It Will Benefit County's Public Defender System, South Bend Trib. (Indiana), June 4, 2007, at A1 (quoting the chief public defender of Lake County, Indiana, as stating that the partnership with the Commission was a "'win-win situation for everybody,'" in part because public defenders were no longer employed by the judges). Such independence protects the integrity of the attorney-client relationship.

A decade after the General Assembly initiated Indiana's reform, the British Parliament enacted a statute to reform England's provision of public legal services. Access to Justice Act, 1999, c. 22 (Eng.); see also 4 Lord Windlesham, Responses to Crime: Dispensing Justice 133-64 (2001) (discussing the reforms aimed at public legal defense services). The problems prompting England's reforms were not lack of independence from judges or ineffective assistance of counsel, as they were in Indiana and across the United States. Rather, England's problems were borne of over-bureaucratizing public legal services. See 4 Windlesham, Responses to Crime, supra, at 135-37 (discussing the ever increasing costs of legal aid in England prior to the Access to Justice Act). Legal services were entirely within the purview of bureaucratic agencies and judges had no role, which resulted in inefficiency and overspending. See id. at 140-41 (discussing the problems with the civil justice system, which were caused by fragmentation and disorganization, and suggesting that the remedy for those problems was to "drive down cost and delay in court proceedings through firm judicial management").

Although indigent defense counsel must have professional independence, judges cannot take a complete "hands-off" approach and totally rely on a bureaucratic agency, lest we develop problems similar to those that occurred in England. In fact, the standard for independence requires only that appointed defense counsel "'be free from political influence and should be subject to judicial supervision only in the same manner and to the same extent as are lawyers in private practice.'" Standards for Indigent Defense Services in Non-Capital Cases, supra, Standard A cmt., at 2 (quoting Standards for Criminal Justice: Providing Defense Services Standard 5-1.3, at 13 (3d ed. 1990)).

In reforming our public defender system, the General Assembly intended for the trial judge to retain some authority with regard to indigent defense counsel. For example, a county's

decision to adopt the Commission's standards and seek reimbursement "does not prevent a court from appointing counsel other than counsel provided for under the board's plan for providing defense services to an indigent person when the interests of justice require." I.C. § 33-40-7-10(a). And a judge can make a written request to the state public defender to have a qualified attorney appointed if the judge determines either "(1) that an attorney provided under the county public defender board's plan is not qualified or available to represent the person; or (2) that in the interests of justice an attorney other than the attorney provided for by the county defender board's plan should be appointed." I.C. § 33-40-7-10(b).

To be sure, trial court judges often receive letters from disgruntled defendants complaining about their appointed lawyers, and many of these complaints – we are willing to assume most – will be unfounded. It would be impossible and unreasonable for a judge to investigate every such complaint. But in instances like this, where appointed counsel has a track record of the professional misconduct complained of, the judge should at minimum require assurance from the public defender's office that the issue will be resolved. This would neither inhibit the independence of public defenders nor impose an onerous burden on our trial judges.

Although the trial court judge failed to receive assurance from the public defender's office in this case, that failure did not prejudice the defendant. Johnson sent his letter three months before trial and then did not raise the issue again until after his sentencing hearing. Counsel appeared several times on Johnson's behalf prior to trial, and both Johnson and his counsel were at trial. Counsel gave an opening statement, cross-examined the prosecution's witnesses, and gave closing arguments. The only witness called by defense counsel was the defendant himself, and his testimony essentially denied everything established by the victim's testimony and that of other prosecution witnesses. The jury, however, found the victim's testimony and the testimony of other prosecution witnesses more reliable and found the defendant guilty. There is nothing to suggest that the outcome would have been different or that the trial was not reliable solely because the trial court failed to receive assurances from the public defender's office that Johnson's complaint had been addressed.

We emphasize that this duty stems not from the Sixth Amendment or any provision of the Indiana Constitution, but from this Court's supervisory powers and a trial court judge's inherent authority over the parties and proceedings before it.

**Conclusion**

We affirm the defendant's conviction.

Shepard, C.J., and Dickson, Rucker, and David, JJ., concur.