## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 28 2019, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

Robert E. Murphy
Pendleton Correctional Facility
Pendleton, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Robert E. Murphy,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

February 28, 2019

Court of Appeals Case No.
53A01-1711-PC-2774

Appeal from the Monroe Circuit Court

The Honorable Teresa D. Harper, Judge

Trial Court Cause No.
53C09-1108-PC-1585

**Crone, Judge.**

## Case Summary

[1] Robert E. Murphy, pro se, appeals the post-conviction court's denial of his petition for post-conviction relief. He asserts that the trial court denied him his right to a fast and speedy trial and that the post-conviction court clearly erred in determining that he failed to demonstrate that he received the ineffective assistance of trial counsel. Concluding that Murphy cannot raise a freestanding claim of trial court error, and further concluding that he has not met his burden to prove that the post-conviction court clearly erred in determining that he failed to demonstrate that he received ineffective assistance, we affirm.

## Facts and Procedural History

[2] The underlying facts as recited by another panel of this Court on direct appeal follow:

> In the afternoon of December 20, 2008, M.H. was running a seventeen-mile route which included a portion of the "unofficial Rails to Trails" in Monroe County. As M.H. was running northbound on the trail just north of Country Club Drive, she passed three other runners going southbound on the trail, including Tracy Gates, whom M.H. recognized because Gates worked at the Bakehouse. Approximately forty-five seconds to a minute later, Murphy, who was running northbound on the path and dressed in "[s]treet clothes, black pants, black shoes and a dark top" and a "stocking cap," passed Gates and the other runners. Gates noticed that Murphy had sustained a significant amount of trauma to his face.
>
> Approximately forty-five seconds to a minute after passing Gates and the other two runners, M.H. heard Murphy's footsteps

behind her and, assuming that it was another runner, moved over to the right to allow the approaching person to pass on the left. Instead of passing her, Murphy "grabbed [M.H.] from behind," which was "pretty forceful" and "like being tackled," so that M.H. "couldn't move around." Murphy held M.H. from behind, held her head secure, and said to her, "I'm not going to do anything sexual to you, I just want your money." M.H. told Murphy that she was "just out running and ... [didn't] have any ... money on [her]."

Murphy then told M.H. to "turn out [her] pockets," and M.H. was eventually able to get a key and an energy gel packet out of the pocket sewn into the waistband of her tights and gave them to Murphy. While still holding M.H., Murphy pulled an ear warmer which M.H. was wearing down over M.H.'s eyes to blindfold her. Murphy then ordered M.H. to take off her shoes, and M.H. took off one shoe and held it up to show Murphy that she did not have anything in the shoe. M.H. then told Murphy she was "going to need to sit down to take off the other shoe ... and take off [her] gloves to undo the shoe laces." Murphy, who was standing over and still holding M.H., then told M.H. to take off her shirt because "he wanted to see if [M.H.] had anything hidden in [her] bra." M.H. pulled her shirt over her head, and Murphy "fumbl[ed]" around between M.H.'s breasts and there was nothing there.

At that point, Murphy pulled up on M.H.'s clothing and sports bra, which exposed M.H.'s breasts. After M.H.'s breasts were exposed, Murphy told M.H. that he wanted her to lick her breasts, but she refused. Murphy put one of his hands on M.H.'s throat and told her again to lick her breasts. M.H. started to cry and complied. Murphy told M.H. to put her shoes back on and to stand up. After M.H. stood up, Murphy, who was behind M.H. and had one of his hands on her neck, forced M.H. forward towards a wooded area or brush near the trail. M.H. "struggled a little bit because [she] didn't want to go back there," and Murphy

said "he would kill [M.H.] if [she] didn't do as he said." M.H. could not see where she was going because she was still blindfolded. M.H. protested and stated "please don't do this" several times.

Once in the wooded area, Murphy gave M.H. a "rougher shove" from behind, and M.H. fell over onto her hands and knees. Murphy pulled down M.H.'s pants and underwear and then pushed M.H. down so that she "was laying flat." Murphy told M.H. that if she did as he said, he would not kill her. Murphy then told M.H. to "roll over so that [she] was lying face upwards." Murphy ordered M.H. to "finger [her] self." M.H. cried and told Murphy "don't do this," and Murphy told her to "stop screaming." M.H. "tried to play along," but Murphy "didn't like it," "leaned in really close," and threatened to hit M.H. if she did not "do it right."

Murphy then made M.H. pull up her shirt and lick her breasts and finger her vagina at the same time. Murphy ordered M.H. to say "I like doing this for you daddy" and "I'm a dirty little whore." Murphy also repeatedly told M.H. that he wanted her to repeat the phrases in a "younger voice." Murphy also ordered M.H. to lick the fingers that had been inside her vagina. From the sounds Murphy was making, M.H. believed that Murphy was aroused and was under the impression that he was masturbating.

At some point, Murphy asked M.H. if she "wanted to suck his cock." M.H. said no, and Murphy grabbed her by her ponytail, pulled her to her knees, told her to open her mouth, and forced his penis into her mouth. M.H. could not breathe and was choking and gagging. Murphy took his penis out of M.H.'s mouth, and she "doubled over a little bit" trying to catch her breath. Murphy forced his penis into M.H.'s mouth a second time, and again Murphy could not breathe.

Murphy told M.H. to stand up and put her clothes on, and she complied. Murphy dropped M.H.'s water bottle, gloves and shirt next to her and told her to take a drink. After M.H. collected her belongings, Murphy guided her over to face a tree and told M.H. to stay there. M.H. heard Murphy "using his foot to scuff over the area somehow." Murphy then told M.H. not to move until he told her, and M.H. heard Murphy move away. Murphy shouted for M.H. to "go," and M.H. stumbled back to the trail. M.H. saw Gates and the other two runners that she had passed earlier in the day running back northbound on the trail. Gates and her friends called the police using M.H.'s cell phone.

The police arrived on the scene and spoke with M.H., Gates, and the other runners. Gates later went to the police station and assisted with the generation of a composite sketch of Murphy by describing his different features and scarring. Bloomington Police Detective Sarah Carnes talked to M.H. about going to the hospital to do a sexual assault kit and STD testing, and M.H. requested Detective Carnes to go with her. Detective Carnes met M.H. and M.H.'s fiancé at Bloomington Hospital. While Detective Carnes was waiting for a room for M.H., she observed Murphy sitting in the emergency room. Detective Carnes noticed Murphy because of the distinct marking on the left side of his face and because "[e]verything about the composite, including the distinct description of the wounds appeared to match the subject that [she] saw sitting in the emergency room."

Detective Carnes spoke with Murphy, and Murphy acknowledged that he wore his black shoes and had walked by the "trail entrance" near Country Club Drive to get his bicycle from a crash that he had been in the previous day. Detective Carnes took photographs of Murphy with his permission, obtained his address, and asked him to submit to an evidence collection kit. M.H. also submitted to a sexual assault victim kit.

Later in the day, police asked Gates to visit the police station again and showed her some photographs of Murphy. Gates recognized Murphy as the person she observed on the trail in street clothes with the markings on the side of his face. At some point after the attack, M.H. observed a story on the internet which included Murphy speaking, and M.H. immediately recognized Murphy's voice.

On December 22, 2008, the State charged Murphy with: Count I, criminal deviate conduct as a class A felony; Count II, sexual battery as a class C felony; Count III, robbery as class C felony; Count IV, criminal confinement as a class D felony; and Count V, intimidation as a class D felony. A bench trial commenced on October 23, 2009, at which the State presented evidence and testimony to identify Murphy as the person who attacked M.H. on December 20, 2008. Murphy was found guilty of Counts I, III, IV, and V as charged and battery as a class B misdemeanor as a lesser included offense of sexual battery under Count II. Murphy's convictions under Counts II and V were merged with his conviction under Count I for sentencing. After a hearing, Murphy was sentenced to fifty years for his conviction for criminal deviate conduct, seven years for his conviction for robbery, and three years for his conviction for criminal confinement, and the court ordered the sentences be served consecutive to each other.

*Murphy v. State*, No. 53A04-1003-CR-149, slip op. at 1-3 (Ind. Ct. App. Dec. 15, 2010) (citations omitted). On direct appeal, Murphy alleged that the State presented insufficient evidence to sustain his convictions, and that his convictions for criminal deviate conduct and criminal confinement violated the prohibition against double jeopardy. Finding the evidence sufficient and no double jeopardy violation, this Court affirmed Murphy's convictions. *Id.*, slip op. at 8-10.

[3]     Murphy filed a pro se petition for post-conviction relief on August 9, 2011. Following a hearing, the trial court entered a detailed order denying Murphy's petition. This appeal ensued.

# Discussion and Decision

[4]     The appellate standard of review regarding post-conviction proceedings is well settled.

> Post-conviction proceedings are civil proceedings in which the defendant must establish his claims by a preponderance of the evidence. Post-conviction proceedings do not offer a super appeal, rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the post-conviction rules. Those grounds are limited to issues that were not known at the time of the original trial or that were not available on direct appeal. Issues available but not raised on direct appeal are waived, while issues litigated adversely to the defendant are res judicata. Claims of ineffective assistance of counsel and juror misconduct may be proper grounds for post-conviction proceedings.

> Because the defendant is appealing from the denial of post-conviction relief, he is appealing from a negative judgment and bears the burden of proof. Thus, the defendant must establish that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision. In other words, the defendant must convince this Court that there is no way within the law that the court below could have reached the decision it did. We review the post-conviction court's factual findings for clear error, but do not defer to its conclusions of law.

*Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013) (citations and quotation marks omitted). We will not reweigh the evidence or judge the credibility of witnesses, and will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Hinesley v. State*, 999 N.E.2d 975, 981 (Ind. Ct. App. 2013), *trans. denied* (2014).

## Section 1 – Murphy cannot raise a freestanding claim of trial court error.

[5] We first address Murphy's assertion that he is entitled to post-conviction relief because the trial court denied him his right to a fast and speedy trial. Post-conviction procedures do not provide a petitioner with an opportunity to present freestanding claims that the original trial court committed error. *Wrinkles v. State*, 749 N.E.2d 1179, 1187 n.3 (Ind. 2001). Rather, "'[i]n post-conviction proceedings, complaints that something went awry at trial are generally cognizable only when they show deprivation of the right to effective counsel or issues demonstrably unavailable at the time of trial or direct appeal.'" *Bunch v. State*, 778 N.E.2d 1285, 1289-90 (Ind. 2002) (quoting *Sanders v. State*, 765 N.E.2d 591, 592 (Ind. 2002)). Murphy makes no attempt to establish that his speedy trial claim was demonstrably unavailable on direct appeal. Thus, the post-conviction court properly denied this freestanding claim of error, and we will only address his claim in the context of ineffective assistance of counsel.

## Section 2 – Murphy has not met his burden to prove that he received ineffective assistance of trial counsel.

[6] Murphy contends that he received ineffective assistance of trial counsel. When evaluating an ineffective assistance of counsel claim, we apply the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *Humphrey v. State*, 73 N.E.3d 677, 682 (Ind. 2017). "To satisfy the first prong, 'the defendant must show deficient performance: representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment.'" *Id*. (*quoting McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002)). To satisfy the second prong, the defendant must show prejudice. *Id*. To demonstrate prejudice from counsel's deficient performance, a petitioner need only show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Middleton v. State*, 72 N.E.3d 891, 891-92 (Ind. 2017) (emphasis and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

[7] Isolated poor strategy, inexperience, or bad tactics does not necessarily constitute ineffective assistance. *Hinesley*, 999 N.E.2d at 982. When considering a claim of ineffective assistance of counsel, we strongly presume "that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. (citation omitted). We presume that counsel performed effectively, and a defendant must offer strong and convincing evidence to overcome this presumption. *Id*.

### *1.1 – Conflict of Interest*

[8]     Murphy contends that his appointed public defender, Patrick Schrems, rendered ineffective assistance at trial due to an alleged "conflict of interest." Appellant's Br. at 16. It is true that "[i]neffective assistance of counsel can occur where counsel is burdened by a conflict of interest, in which case special rules apply." *Johnson v. State*, 948 N.E.2d 331, 335 (Ind. 2011) (citations and footnote omitted). However, we agree with the post-conviction court that Murphy merely disagreed with how Schrems was representing him, but he never alleged an actual conflict of interest; namely, he never alleged that Schrems's loyalties were divided between Murphy and another client. An actual conflict of interest is quite different from disagreements with one's counsel or an ordinary case of alleged attorney neglect. *See Johnson v. State*, 948 N.E.2d 331, 335 (Ind. 2011) (noting that the only cases in which the U.S. Supreme Court has applied special conflict of interest rules to ineffective assistance of counsel are those where counsel is engaged in multiple representation). Murphy does not point to any division of loyalties or identify any other client or interest to which his counsel owed a duty. Murphy has failed to establish that his trial counsel was burdened with a conflict of interest.[1]

---

[1] Murphy suggests that his filing disciplinary complaints against Schrems with the Indiana Supreme Court Disciplinary Commission both during and after his trial created an actual conflict of interest. We disagree, as the personal conflict of interest that would have been created is not the type of conflict to which any special rules apply. *Johnson*, 948 N.E.2d at 335 n.5.

### *1.2 – Fast and Speedy Trial*

[9]     The crux of Murphy's ineffective assistance of counsel claim is his assertion that his trial counsel failed to move for a fast and speedy trial on his behalf despite his clear indication that he wanted a speedy trial. Our supreme court has stated that an attorney may indeed be ineffective when he or she fails to file a motion for a speedy trial on behalf of the client. *Broome v. State*, 694 N.E.2d 280, 281 (Ind. 1998). Specifically, the court explained that "[t]here *may* exist circumstances in which defense counsel's refusal or neglect to file a speedy trial motion specifically requested by a defendant could constitute deficient performance to support a claim of ineffective assistance of counsel." *Id.* (emphasis added). However, such circumstances did not exist in *Broome*. The defendant in *Broome* attempted to request a speedy trial during a pre-trial conference. His counsel opposed the request, explaining that he could not properly prepare for the trial within the prescribed seventy days pursuant to Criminal Rule 4(B). *Id.* Our supreme court explained that "[w]hen counsel's action or inaction is premised upon matters relating to trial preparation, such decisions are matters of trial strategy and the power to make binding decisions of trial strategy is generally allocated to defense counsel." *Id.* Consequently, the *Broome* court rejected the defendant's claim of ineffective assistance.

[10]    Here, Murphy inquired about a speedy trial during his initial hearing. The trial court instructed him to speak with his attorney, once one was appointed, about a speedy trial. Attorney Shrems testified during the post-conviction hearing that he did not recall whether Murphy ever discussed with him his desire for a

speedy trial. Nevertheless, he stated that any decision by him not to file a speedy trial motion was strategic. Specifically, he stated that he would not have had enough time to prepare an adequate defense due to the complexity and amount of evidence, including DNA evidence,[2] that was involved in Murphy's case. Schrems explained, "[G]iven the nature of the case, there was so much information that we had to work through, … it just was not … feasible to work in the time frame." Tr. Vol. 2 at 34. Thus, Shrems's action or inaction was premised on matters relating to trial preparation which are considered matters of trial strategy generally relegated to defense counsel. Murphy has failed to present strong and convincing evidence to overcome the presumption that Schrems rendered adequate assistance on this issue.[3]

[11] In sum, Murphy has not met his burden to show that the post-conviction court clearly erred in determining that he failed to demonstrate that he received

---

[2] It appears that Murphy was hoping that the State would have been forced to go to trial before receiving DNA test results. He argues, "If there is not any DNA then no fact-finder can place appellant in contact with the 'victim' which brings about reasonable doubt." Appellant's Br. at 12. However, as noted by the post-conviction court, even had Schrems filed a speedy trial motion, the State would have been entitled to seek a continuance pursuant to Criminal Rule 4(D).

[3] Moreover, the post-conviction court found that Murphy waived his right to a speedy trial on more than one occasion. Specifically, the post-conviction court found that Murphy waived his right on May 13, 2009, when the case was set for a June 22, 2009 bench trial, and again on June 19, 2009, when he acquiesced to a continuance and signed a document stating that "he understood the bench trial would be delayed and that he was waiving his right to a speedy trial." Appellant's Br. at 30. His counsel explained to the trial court that the continuance was necessary to accommodate independent DNA testing by the defense. Murphy agreed to the continuance on the record, stating that he agreed to the continuance to allow time for the independent testing because he wanted to be "sure." *Id*. at 31. Indeed, when asked by the trial court if he favored a continuance, Murphy replied, "Overall, yes." *Id*. Murphy does not challenge the post-conviction court's findings in this regard.

ineffective assistance of trial counsel. Accordingly, we affirm the denial of his petition for post-conviction relief.

[12] Affirmed.

Vaidik, C.J., and Mathias, J., concur.